**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re Wilmer Cutler Pickering Hale & Dorr LLP, Data Breach Litigation**<br><br>**JASON PERRY**<br>3017 Mathers Mill Road<br>Lafayette Hill, PA 19444<br><br>**EMILY EGAN**<br>141 East High Street<br>Glassboro, NJ 08028<br><br>**TOMELLA JEFFERIES**<br>9656 Brassie Way<br>Montgomery Village, MD 20886<br><br>**MARK LEVEY**<br>4837 62nd Street North<br>Kenneth City, FL 33709<br><br>*individually and on behalf of all others similarly situated;*<br><br>*Plaintiffs*,<br><br>v.<br><br>**WILMER CUTLER PICKERING HALE AND DORR LLP**,<br><br>*Defendant*. | Case No.: 1:26-CV-2470-EGS<br><br>**CONSOLIDATED AMENDED COMPLAINT-CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Jason Perry, Emily Egan, Tomella Jeffries and Mark Levey ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. For their Consolidated Amended

Class Action Complaint and Jury Demand, Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. Plaintiffs bring this class action lawsuit against Defendant for its negligent failure to protect and safeguard Plaintiffs' and Class Members highly sensitive personally identifiable information ("PII" or "Private Information"), culminating in a massive and preventable data breach (the "Data Breach" or "Breach"). As a result of Defendant's failure to implement reasonable and necessary data security practices, cybercriminals easily infiltrated Defendant's inadequately protected computer systems and stole the Private Information of current and former clients of Defendant ("Class Members").

2. WilmerHale is a leading international law firm with more than 1,100 lawyers located throughout 12 offices in the United States and Europe.[1]

3. As part of its business practices and to provide services, Defendant collects, stores, and maintains clients' PII, including Plaintiffs' and Class Members'.

4. On May 8, 2026, Defendant provided information to an unauthorized third party who misrepresented their identity.[2]

5. On July 15, 2026, Defendant mailed Plaintiffs a Notice Letter advising them the personally identifiable information compromised in the Data Breach included certain personal information of Plaintiffs. This Private Information included but is not limited to their names and Social Security numbers. Notice of Data Security Incident, **Exhibits A-C** attached hereto.

---

[1] WilmerHale, *About Us*: https://www.wilmerhale.com/en/about (last visited September 16, 2026).
[2] Exhibit A – Notice Letter.

6. The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted in the course of their client relationships with Defendant.

7. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguard practices related to the storage of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been disclosed to an unauthorized third party and precisely what type of information was disclosed.

8. Defendant maintained the Private Information in a reckless manner. In particular, Defendant's procedures for verifying the identity of individuals requesting Private Information were vulnerable to exploitation by imposters and other bad actors. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

9. Defendant, through its employees, disregarded the rights of Plaintiffs and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data-handling and identity-verification protocols were protected against exploitation by imposters and other unauthorized third parties. Defendant also failed to disclose that it did not have adequately robust data security practices to safeguard Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

10. In addition, Defendant's employees failed to properly verify the identity of the third party who requested Plaintiffs' and Class Members' Private Information. Had Defendant's employees properly verified that individual's identity before disclosing the Private Information, the Data Breach would have been prevented.

11. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

12. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13. Because of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14. Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17. Accordingly, Plaintiffs brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II. PARTIES

18. Plaintiff Jason Perry is an individual and, at all relevant times herein, was a resident and citizen of North Las Vegas, Nevada. Upon information and belief, Plaintiff Perry is a victim of the Data Breach.

19. Plaintiff Emily Egan is an individual and, at all relevant times herein, was a resident and citizen of Glassboro, New Jersey. Plaintiff Egan received a Notice Letter from Defendant dated July 15, 2026, informing Plaintiff Egan that her personal information, including name and Social Security number, was involved in the Data Breach.[3]

20. Plaintiff Tomella Jefferies is an individual and, at all relevant times herein, was a resident and citizen of Montgomery Village, Maryland. Plaintiff Jefferies received a Notice Letter from Defendant dated August 12, 2026, informing Plaintiff Jefferies that her personal information, including Social Security number and date of birth, was involved in the Data Breach.[4]

21. Plaintiff Mark Levey is an individual and, at all relevant times herein, was a resident and citizen of Kenneth City, Florida. Plaintiff Levey received a Notice Letter from Defendant

---

[3] Exhibit A – Plaintiff Egan's Notice Letter.
[4] Exhibit B – Plaintiff Jefferies Notice Letter.

dated August 12, 2026, informing Plaintiff Levey that his personal information, including Social Security number and date of birth, was involved in the Data Breach.[5]

22. Defendant is a limited liability partnership maintaining its principal place of business at 2100 Pennsylvania Avenue, NW, Washington, DC 20037.

23. Defendant's registered agent for service of process is Michael R. Heyison, 2100 Pennsylvania Avenue, NW, Washington, DC 20037.

## III. JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the Class, and at least one member of the Class is a citizen of a State different from Defendant, including Plaintiff.

25. This Court has personal jurisdiction over Defendant because Defendant regularly conducts and solicits business in this District and throughout the United States, Defendant has purposefully availed itself of the privileges of conducting business activities within this District, and the wrongful conduct giving rise to this action occurred in substantial part within this District.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant has caused harm to Plaintiff and Class Members residing in this District.

[5] Exhibit C – Plaintiff Levey's Notice Letter.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business***

27. Defendant is an international law firm providing legal representation to corporate, governmental, and individual clients across a broad range of practice areas, with more than 1,100 lawyers located throughout offices in the United States and Europe.[6]

28. In the ordinary course of providing legal services and/or as part of its business practices Defendant, directly or indirectly collected Plaintiffs and class members sensitive, personal, and private information, such as his or her:

- address;
- telephone number;
- date of birth;
- Social Security number;
- driver's license number;
- driver's license state;
- financial account information;

29. By soliciting and accepting the Private Information of Plaintiffs and Class members, Defendant agreed to and undertook legal duties to maintain the protected personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws.

30. Defendant obtains, collects, uses, and derives a benefit from the Private Information of Plaintiffs and Class Members. Defendant uses the Private Information it collects to provide legal services, making a profit therefrom. Defendant would not be able to obtain revenue if not for the acceptance and use of Plaintiffs' and the Class's Private Information.

---

[6] Defendant WilmerHale, "About Us" available at https://www.wilmerhale.com/en/about (last accessed July 26, 2026).

31. Defendant would be unable to engage in its regular business activities without collecting and aggregating Private Information it knows and understands to be sensitive and confidential.

32. Defendants own Privacy Policy warrants and assures that Defendant will adequately protect collected Private Information from unauthorized disclosure to third parties. [7]

33. The information held by Defendant in its computer system and network included the Private Information of Plaintiffs and Class Members.

***The Data Breach***

34. A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by an entity like Defendant.

35. Defendant stored Plaintiffs' and the Class Members' Private Information on its computer systems and servers.

36. Unfortunately, Defendant failed to take adequate measures to protect Private Information stored on its computer servers, including failing to implement reasonable cybersecurity safeguards or policies to protect Private Information, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems.

37. As a direct result of Defendant's failures, on or about July 15, 2026, Defendant sent Plaintiffs and Class Members a letter explaining that, on May 8, 2026, one of Defendant's personnel mistakenly provided Plaintiffs' and Class Members' Private Information to an

[7] https://www.wilmerhale.com/en/privacy-policy

unauthorized third party who had misrepresented their identity to Defendant's personnel.[8] The information disclosed included at least their name and Social Security number.[9]

38. Omitted from the notice were the identity of the unauthorized third party who received Plaintiffs' and Class Members' Private Information, the details of the root cause of the Data Breach, the internal control failures that allowed the disclosure to occur, and the remedial measures undertaken to ensure such a disclosure does not occur again. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

39. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

40. Despite Defendant's limited disclosure about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that Defendant's own personnel disclosed Plaintiffs' and Class Members' Private Information to a person outside Defendant's organization; b) that Defendant's personnel did so because that person misrepresented their identity to Defendant, meaning Defendant's internal verification procedures failed to catch the misrepresentation before sensitive data was released; and c) that the information disclosed included Plaintiffs' and Class Members' names and Social Security numbers, and other sensitive information.

41. In the context of Notice of Data Security Incident letters of this type, Defendant's characterization of the incident as one of Defendant's own personnel having "mistakenly

[8] *See* Notice of Data Security Incident, attached hereto as **Exhibit A-C**.
[9] *Id.*

provided" Plaintiffs' and Class Members' Private Information to a third party who "misrepresented their identity" minimizes that it was Defendant's own conduct. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons who Defendant itself has a reasonable belief that such personal information was disclosed to or obtained by an unauthorized individual or entity. Defendant cannot hide behind legalese—by sending a Notice of Data Security Incident letter to Plaintiffs and Class Members, it admits that Defendant itself has a reasonable belief that Plaintiffs' and Class Members' names and Social Security numbers, and other sensitive information was disclosed to and obtained by an unauthorized third party.

42. In its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact Class Members whose Private Information was disclosed in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

43. Notwithstanding Defendant's assurances that it is unaware of further disclosure or misuse, once Plaintiffs' and Class Members' Private Information was disclosed to and obtained by an unauthorized third party who misrepresented their identity to acquire it, Plaintiffs and the members of the proposed Class cannot rule out that their Private Information may be sold, disseminated, or otherwise misused, including on the dark web, for fraudulent and criminal purposes.

44. The insurance-industry trade publication, The Insurer, reported that Luna Moth/ Silent Ransom Group was responsible and that Defendant paid at least $18 million in a ransom or suppression payment.[10]

45. The FBI's May 23, 2025 TLP:CLEAR notice identifies Silent Ransom Group (SRG), also known as Luna Moth, Chatty Spider and UNC3753, as a threat actor targeting U.S. law firms through IT-themed social-engineering calls, impersonation of internal IT personnel and data-theft extortion.

46. Defendant had obligations created by contract, industry standards, and common law to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

47. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiff's and Class Members' Private Information safe and confidential.

48. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

49. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

---

[10] https://www.theinsurer.com/cyber-risk/news/exclusive-wilmerhale-paid-at-least-18-million-ransom-to-luna-moth-as-cna-covered-2026-08-07/

50. In 2024, a record 3,158 data breaches occurred, resulting in around 1,350,835,988 individuals' information being compromised, a 211% increase from 2023.[11]

51. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

52. Data thieves regularly target law firms like Defendant due to the highly sensitive information in its custody. In recent years, multiple AmLaw100 law firms have been the subject of data breaches, and these breaches have been widely publicized. Because of the ubiquity of law firm data breaches, Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

53. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[12]

54. As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers. Accordingly, the credit monitoring and identity theft protection which Defendant offered in the Notice of Data Security Incident are wholly insufficient to compensate Plaintiffs and the Class Members for their damages resulting from the Data Breach.

---

[11] *See* Identity Theft Resource Center, *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited July 25, 2026).
[12] IBM, *Cost of a Data Breach 2022: A Million-Dollar Race to Detect and Respond*," https://www.ibm.com/reports/data-breach (last visited July 25, 2026).

55. Defendant's offer to supply Plaintiffs and the Class Members with credit monitoring services supports the reasonable belief that Plaintiffs' and the Class Members' PII is at meaningful risk of being misused, sold, or published by the unauthorized third party who obtained it, or others.

***Data Breaches Are Preventable***

56. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as verifying the identity of individuals requesting Private Information before disclosing it.

57. Defendant could have prevented this Data Breach by, among other things, implementing reasonable procedures to verify the identity of individuals requesting Private Information before disclosing it.

58. Given that Defendant was storing the Private Information of its current and former clients, Defendant could and should have implemented reasonable identity-verification and data-handling procedures to prevent the unauthorized disclosure of that information.

59. The occurrence of the Data Breach indicates that Defendant failed to adequately implement reasonable identity-verification and data-handling procedures, resulting in the Data Breach and the disclosure of the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

***Plaintiffs' Experience***

*Plaintiff Jason Perry*

60. Defendant obtained Plaintiff Perry's Private Information, either directly or indirectly, in the course of providing legal services and/or as part of its business practices. 61.

61. Plaintiff Perry received a Notice Letter from the Defendant, informing him that his Private Information, including his name and Social Security number, were involved in the Breach.

62. By soliciting, accepting, and storing Plaintiff Perry's Private Information, Defendant agreed to safeguard and protect it from unauthorized disclosure and delete it after a reasonable time.

63. Upon information and belief, Defendant was in possession of Plaintiff Perry's Private Information before, during, and after the Data Breach.

64. As a result, Plaintiff Perry was injured by Defendant's Data Breach.

65. In response to the Data Breach, Plaintiff Perry made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Perry estimates he has already spent at least fifteen (15) hours responding to the Data Breach.

66. Plaintiff Perry will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

67. Plaintiff Perry places significant value in the security of his Private Information and does not readily disclose it.

68. Because of the Data Breach, Plaintiff Perry's highly confidential Private Information is in the hands of cybercriminals. The *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Perry and the Class are at an imminent risk of identity theft and fraud.

69. After the Data Breach, Plaintiff Perry noticed a significant increase in spam communications. Specifically, since the Data Breach, Plaintiff Perry started receiving daily spam

calls and texts related to offers of line of credit Plaintiff Perry did not request. Due to the increase in spam communications, on September 16, 2026, Plaintiff Perry purchased McAfee Advance annual subscription at a cost of $95.39 which will renew at a cost of $149.99 (plus taxes). This is a cost that Plaintiff Perry would otherwise not have purchased but for the Data Breach and Plaintiff Perry's attempt to mitigate the consequences of the Breach.

70. Upon information and belief, Defendant had in its possession Plaintiff Perry's Private Information, including phone number, at the time of the Breach. Plaintiff Perry did not receive this level of spam communications prior to the Breach. The sharp increase in spam communication indicates that Plaintiff Perry's personal information, including phone number, has been misused after the Breach. Plaintiff Perry attributes the increase in spam communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that the increase in spam communications is atypical in Plaintiff Perry's experience.

71. Plaintiff Perry suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

72. Plaintiff Perry suffered actual injury in the form of damages to and diminution in the value of his Private Information. PII is a form of intangible property—property that Defendant was required to adequately protect and safeguard against unauthorized disclosure.

73. Due to Defendant's Breach, Plaintiff Perry will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff's highly sensitive Private

Information, including his Social Security number, secure and protected against unauthorized disclosure.

74. Plaintiff Perry's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

75. Knowing that thieves intentionally targeted and accessed his Private Information, has caused Plaintiff Perry great anxiety beyond mere worry.

76. The Data Breach has caused Plaintiff Perry to suffer fear, anxiety, and stress.

77. Plaintiff Perry has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

78. As a direct and traceable result of the Data Breach, Plaintiff Perry suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (vii) other economic and non-economic harm.

79. Plaintiff Perry has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for ***years*** to come. This risk is real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

80. Plaintiff Perry has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Perry's Private Information will be wholly unprotected and at-risk of future data breaches.

*Plaintiff Emily Egan*

81. Defendant obtained Plaintiff Egan's Private Information, either directly or indirectly, in the course of providing legal services and/or as part of its business practices.

82. Plaintiff Egan received a Notice Letter from the Defendant postmarked July 15, 2026, informing her that her Private Information, including her name and Social Security number, were involved in the Breach.

83. By soliciting, accepting, and storing Plaintiff Egan's Private Information, Defendant agreed to safeguard and protect it from unauthorized disclosure and delete it after a reasonable time.

84. Upon information and belief, Defendant was in possession of Plaintiff Egan's Private Information before, during, and after the Data Breach.

85. As a result, Plaintiff Egan was injured by Defendant's Data Breach.

86. In response to the Data Breach, Plaintiff Egan made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, changing her username and passwords with her accounts, reviewing spam notifications, and reviewing her credit reports. Plaintiff Egan estimates she has already spent at least twenty (20) hours responding to the Data Breach.

87. Plaintiff Egan will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

88. Plaintiff Egan places significant value in the security of her Private Information and does not readily disclose it. 89. Because of the Data Breach, Plaintiff Egan's highly confidential Private Information is in the hands of cybercriminals. The *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Egan and the Class are at an imminent risk of identity theft and fraud.

90. After the Data Breach, Plaintiff Egan noticed a significant increase in spam communications. Specifically, since June 2026, Plaintiff Egan started receiving numerous spam texts and emails related to phishing attempts to obtain additional personal information from Plaintiff Egan and links requesting Plaintiff to click on the links to direct her to external sources. Upon information and belief, Defendant had in its possession Plaintiff Egan's Private Information, including phone number and email address, at the time of the Breach. Plaintiff Egan did not receive this level of spam communications prior to the Breach. The sharp increase in spam communication indicates that Plaintiff Egan's personal information, including phone number and email, has been misused after the Breach. Plaintiff Egan attributes the increase in spam communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that the increase in spam communications is atypical in Plaintiff Egan's experience.

91. Plaintiff Egan suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

92. Plaintiff Egan suffered actual injury in the form of damages to and diminution in the value of her Private Information. PII is a form of intangible property—property that Defendant was required to adequately protect and safeguard against unauthorized disclosure.

93. Due to Defendant's Breach, Plaintiff will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff's highly sensitive Private Information, including her Social Security number, secure and protected against unauthorized disclosure.

94. Plaintiff Egan's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

95. Knowing that thieves intentionally targeted and accessed her Private Information, has caused Plaintiff Egan great anxiety beyond mere worry.

96. The Data Breach has caused Plaintiff Egan to suffer fear, anxiety, and stress..

97. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

98. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased

risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff ; and (vii) other economic and non-economic harm.

99. Plaintiff Egan has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for ***years*** to come. This risk is real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

100. Plaintiff Egan has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Egan's Private Information will be wholly unprotected and at-risk of future data breaches.

*Plaintiff Tomella Jefferies*

101. Defendant obtained Plaintiff Jefferies's Private Information, either directly or indirectly, in the course of providing legal services and/or as part of its business practices.

102. Plaintiff Jefferies received a Notice Letter from the Defendant postmarked August 12, 2026, informing her that her Private Information, including her Social Security number and date of birth, were involved in the Breach.

103. By soliciting, accepting, and storing Plaintiff Jefferies's Private Information, Defendant agreed to safeguard and protect it from unauthorized disclosure and delete it after a reasonable time.

104. Upon information and belief, Defendant was in possession of Plaintiff Jefferies's Private Information before, during, and after the Data Breach.

105. As a result, Plaintiff Jefferies was injured by Defendant's Data Breach.

106. In response to the Data Breach, Plaintiff Jefferies made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, placing a freeze on her credit, and reviewing her credit reports. Plaintiff Jefferies estimates she has already spent at least three (3) hours responding to the Data Breach.

107. Plaintiff Jefferies will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

108. Plaintiff Jefferies places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Jefferies entrusted Defendant with her Private Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Private Information would not be compromised.

109. Because of the Data Breach, Plaintiff Jefferies's highly confidential Private Information is in the hands of cybercriminals. The *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Jefferies and the Class are at an imminent risk of identity theft and fraud.

110. After the Data Breach, Plaintiff Jefferies noticed a significant increase in spam communications. Specifically, since June 2026, Plaintiff Jefferies estimates she receives approximately 25 spam calls per week, 20 spam texts per week, and 30 spam emails per week all related to auto loan offers, bank loans, and credit card application inquiries that Plaintiff Jefferies did not request and phishing attempts to try and get additional personal information from Plaintiff. Upon information and belief, Defendant had in its possession Plaintiff Jefferies's Private

Information, including phone number and email address, at the time of the Breach. Plaintiff Jefferies did not receive this level of spam communications prior to the Breach. The sharp increase in spam communication indicates that Plaintiff Jefferies's personal information, including phone number and email, has been misused after the Breach. Plaintiff Jefferies attributes the increase in spam communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that the increase in spam communications is atypical in Plaintiff Jefferies's experience.

111. Plaintiff Jefferies suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

112. Plaintiff Jefferies suffered actual injury in the form of damages to and diminution in the value of her Private Information. PII is a form of intangible property—property that Defendant was required to adequately protect and safeguard against unauthorized disclosure.

113. Due to Defendant's Breach, Plaintiff will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff's highly sensitive Private Information, including her Social Security number, secure and protected against unauthorized disclosure.

114. Plaintiff Jefferies's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

115. Knowing that thieves intentionally targeted and accessed her Private Information, has caused Plaintiff Jefferies great anxiety beyond mere worry.

116. The Data Breach has caused Plaintiff Jefferies to suffer fear, anxiety, and stress.

117. Plaintiff Jefferies has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

118. As a direct and traceable result of the Data Breach, Plaintiff Jefferies suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff ; and (vii) other economic and non-economic harm.

119. Plaintiff Jefferies has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for ***years*** to come. This risk is real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

120. Plaintiff Jefferies has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Jefferies's Private Information will be wholly unprotected and at-risk of future data breaches.

*Plaintiff Mark Levey*

121. Defendant obtained Plaintiff Levey's Private Information, either directly or indirectly, in the course of providing legal services and/or as part of its business practices.

122. Plaintiff Levey received a Notice Letter from the Defendant postmarked August 12, 2026, informing him that his Private Information, including his Social Security number and date of birth, were involved in the Breach.

123. By soliciting, accepting, and storing Plaintiff Levey's Private Information, Defendant agreed to safeguard and protect it from unauthorized disclosure and delete it after a reasonable time.

124. Upon information and belief, Defendant was in possession of Plaintiff Levey's Private Information before, during, and after the Data Breach.

125. As a result, Plaintiff Levey was injured by Defendant's Data Breach.

126. In response to the Data Breach, Plaintiff Levey made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing her credit reports. Plaintiff Levey estimates he has already spent at least six (6) hours responding to the Data Breach.

127. Plaintiff Levey will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

128. Plaintiff Levey places significant value in the security of his Private Information and does not readily disclose it. Plaintiff Levey entrusted Defendant with his Private Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Private Information would not be compromised.

129. Because of the Data Breach, there is no doubt Plaintiff Levey's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of

cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Levey and the Class are at an imminent risk of identity theft and fraud.

130. After the Data Breach, Plaintiff Levey noticed a significant increase in spam communications. Specifically, since the end of May 2026, Plaintiff Levey started receiving approximately 10 spam calls per week relating to claims that he won the lottery or the Publishers Clearing House sweepstakes and phishing attempts to try and obtain additional personal information from Plaintiff Levey. Upon information and belief, Defendant had in its possession Plaintiff Levey's Private Information, including phone number, at the time of the Breach. Plaintiff Levey did not receive this level of spam communications prior to the Breach. The sharp increase in spam communication indicates that Plaintiff Levey's personal information, including phone number, has been misused after the Breach. Plaintiff Levey attributes the increase in spam communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that the increase in spam communications is atypical in Plaintiff Levey's experience.

131. Plaintiff Levey suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

132. Plaintiff Levey suffered actual injury in the form of damages to and diminution in the value of his Private Information. PII is a form of intangible property—property that Defendant was required to adequately protect and safeguard against unauthorized disclosure.

133. Due to Defendant's Breach, Plaintiff Levey will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a

consequence of Defendant's breach of duty to maintain Plaintiff's highly sensitive Private Information, including his Social Security number, secure and protected against unauthorized disclosure.

134. Plaintiff Levey's highly sensitive Private Information accessed in the Breach provides hackers with a clear ability to commit fraud.

135. Knowing that thieves intentionally targeted and accessed his Private Information, has caused Plaintiff Levey great anxiety beyond mere worry.

136. The Data Breach has caused Plaintiff Levey to suffer fear, anxiety, and stress.

137. Plaintiff Levey has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

138. As a direct and traceable result of the Data Breach, Plaintiff Levey suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (vii) other economic and non-economic harm.

139. Plaintiff Levey has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for ***years*** to come. This risk is real and impending,

and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

140. Plaintiff Levey has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Levey's Private Information will be wholly unprotected and at-risk of future data breaches.

***Value of Private Information***

141. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13] Those regulations describe "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

142. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[15]

---

[13] 17 C.F.R. § 248.201 (2013).

[14] *Id.*

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

143. For example, Personal Information can be sold at a price ranging from $40 to $200.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

144. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

145. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

146. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[17] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

147. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

148. Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

***Defendant Failed to Comply with FTC Guidelines***

149. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

150. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[18] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is

[18] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 25, 2026).

attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

151. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

152. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

153. Defendant failed to properly implement basic data security practices.

154. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former clients' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

155. Defendant was always fully aware of its obligation to protect the PII of its current and former clients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

---

[19] *Id.*

***Defendant Failed to Comply with Industry Standards***

156. Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

157. Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

158. Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

159. Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

160. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

161. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02,

PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

162. Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Caused Plaintiffs and the Class Members Injury and Damages***

163. Plaintiffs and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

164. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

165. Data Breaches such as the one experienced by Defendant's clients are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

166. As stated prior, on information and belief, in the Data Breach, an unauthorized third party obtained Plaintiffs' and the proposed Class Members' Private Information, which may now be used or will imminently be used for fraudulent purposes and/or may be sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

167. Once an individual's Private Information is for sale and accessible on the dark web, cybercriminals are able to use the stolen and compromised data to gather and steal even more information.[20]

168. The ramifications of Defendant's failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

169. Because Defendant failed to prevent the Data Breach, Plaintiffs and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of privacy and the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress and anxiety;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

---

[20] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited July 25, 2026).

h. The diminution in value of their Private Information;

i. Delay in receipt of tax refund monies; and,

j. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

***The Data Breach Caused Plaintiffs and the Class Members Increased Risk of Identity Theft***

170. Furthermore, the Data Breach has placed Plaintiffs and the proposed Class Members at an increased risk of fraud and identity theft.

171. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiffs' and Class Members' PII falling into the hands of identity thieves.

172. The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

173. Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

174. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

175. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

176. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

177. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone

steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[21]

178. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

179. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [22] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[23]

180. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

---

[21] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited July 25, 2026).
[22] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[23] *Id.*
[24] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

181. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[25] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[26]

182. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

183. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

184. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[25] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[26] *See* https://www.investopedia.com/terms/s/ssn.asp

185. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

186. The California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[28]

187. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

188. What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

189. PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[27] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

[28] *See* https://oag.ca.gov/idtheft/facts/your-ssn

190. Where the most PII belonging to Plaintiffs and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

191. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

192. Thus, Plaintiffs and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

193. Accordingly, the Data Breach has caused Plaintiffs and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

194. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 24 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

195. Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

196. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

197. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

198. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

199. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiffs' and Class Members' Social Security numbers or other government identification are affected.

200. By spending this time, Plaintiffs were not manufacturing their own harm, they were taking necessary steps at Defendant's direction and because the Data Breach included their Social Security numbers.

201. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because

of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

202. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[29]

***Diminution in Value of Private Information***

203. PII is a valuable property right.[30] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

204. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[31]

205. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[32]

---

[29] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[30] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[31] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 25, 2026).

[32] https://datacoup.com/ (last visited July 25, 2026).

206. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[33]

207. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

208. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

209. Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

210. Given the risks to Plaintiffs and the Class Members, the future cost of credit and identity theft monitoring is both reasonable and necessary.

211. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect

[33] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 25, 2026).

Plaintiff and the Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

## V. DEFENDANT'S BREACH

212. Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to store files containing sensitive data in an encrypted state;

e. Failing to train employees in the proper handling of emails containing malicious software, and to maintain adequate email security practices;

f. Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

g. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

h. Failing to adhere to industry standards for cybersecurity.

213. As a result of inadequate procedures for verifying the identity of individuals requesting Private Information, and inadequately trained personnel who failed to detect and prevent the disclosure of Private Information to an individual who misrepresented their identity, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

214. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

## VI. PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

215. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 24 months of inadequate credit monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

216. The 24 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

217. Defendant's credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

218. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

219. Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

220. Plaintiffs were damaged in that their Private Information is in the hands of cyber criminals.

221. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

222. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

223. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, and similar identity theft.

224. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

225. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

226. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

227. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

228. Plaintiffs and Class Members have suffered or will suffer actual injury as a result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket

expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

229. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

230. Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

231. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII. CLASS ACTION ALLEGATIONS

232. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

233. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

234. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All persons whose Private Information was compromised because of the May 2026 Data Breach, including all persons who received a Notice Letter (the "Class").**

235. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

236. Plaintiffs reserve the right to amend or modify the above Class definition or to propose subclasses in subsequent pleadings and motions for class certification.

237. The proposed Class meets the requirements of FRCP 23.

238. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number and identities of Class Members are unknown to Plaintiffs at this time, as such information is in the sole possession of Defendant and ascertainable through its records.

239. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiffs and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant was unjustly enriched;

and

k. Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

240. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant.

Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

241. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

242. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

243. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

244. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

245. Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance the matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant failed to timely notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

246. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VIII. <u>CAUSES OF ACTION</u>

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

247. Plaintiffs re-allege and incorporate paragraphs 1-246 is fixed we may need to change this. as if fully restated here.

248. Defendant solicited, gathered, and stored the Private Information of Plaintiffs and the Class as part of the operation of its business and n order to gain profit.

249. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

250. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

251. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

252. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

253. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

254. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

255. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

256. Defendant violated the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

257. Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to implement reasonable and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information.

258. As a direct and proximate result of Defendant's negligent conduct, including, but not limited to, its failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

259. As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement adequate data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

260. The damages Plaintiffs and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's negligent conduct.

261. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

262. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

263. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

264. Plaintiffs re-allege and incorporate paragraphs 1-246 as if fully restated here.

265. Plaintiffs bring this claim individually and on behalf of all Class Members.

266. Upon information and belief, Defendant funds its data security measures entirely from its general revenue.

267. As such, a portion of the revenue attributable to the receipt and use of Plaintiffs' and Class Members' PII is to be used to provide a reasonable level of data security, and the portion of those revenues that is allocated to data security is known to Defendant.

268. Plaintiffs and Class Members conferred a monetary benefit on Defendant by virtue of their PII being used for Defendant's business purposes. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and appropriate protection for their Private Information.

269. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

270. Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

271. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

272. Defendant failed to secure Plaintiffs' and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiffs and Class Members provided.

273. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

274. Defendant benefitted from collecting and using Plaintiffs' and Class Members' sensitive Private Information for business purposes. Yet Defendant failed to bear the costs of safeguarding that same information, instead shifting the risk of harm to the individuals who entrusted their PII.

275. Plaintiffs and Class Members conferred a direct and valuable benefit on Defendant by providing their sensitive PII, which Defendant accepted and used in the operation of its business. Because Defendant failed to provide reasonable data protections in exchange, equity and

good conscience dictate that Defendant should not be allowed to retain the benefit without providing adequate safeguards.

276. Plaintiffs and Class Members directly or indirectly gave Defendant their sensitive personal data, a valuable asset in its own right, which Defendant used to further its business operations while cutting costs on security. Defendant's retention of this benefit without adequate protection is inequitable.

277. Plaintiffs and Class Members have no adequate remedy at law.

278. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

a. the substantial and imminent risk of identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and Class Members.

279. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

280. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, the economic value and profits they unjustly received from Plaintiffs' and Class Members' business and patronage.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are proper representative of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. For an Order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h. Pre- and post-judgment interest on any amounts awarded; and

i. Any other relief that this court may deem just and proper.

## X. JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

DATED: September 17, 2026

Respectfully submitted,

*/s/ Mariya Weekes*
Mariya Weekes (*Pro Hac Vice*)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, Florida 33131
Tel: (786) 206-9057
mweekes@milberg.com

Leigh S. Montgomery (*Pro Hac Vice*)
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455

Laura Van Note (*Pro Hac Vice* Forthcoming)
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Tel: (510) 891-9800
lvn@colevannote.com

**INTERIM CO-LEAD CLASS COUNSEL**

David Hilton Wise (DC Bar No. 427796)
**WISE LAW FIRM, PLC**
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Tel: (703) 934-6377
dwise@wiselaw.pro

**INTERIM LIASION COUNSEL**

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 17, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing.

*/s/ Mariya Weekes*
Mariya Weekes